**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KENNILLE COLLINS, individually, and on behalf of all others similarly situated,<br><br>    *Plaintiff*,<br><br>  v.<br><br><br>HIGH 5 ENTERTAINMENT, LLC d/b/a HIGH 5 CASINO<br>    *Defendant*. | Case No._____ |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kennille Collins ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant High 5 Entertainment, LLC d/b/a High 5 Casino ("Defendant" or "High 5" or "High 5 Casino"), based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon her personal knowledge.

### NATURE OF THE CASE

1. This case arises out of Defendant's operation of an illegal online casino in violation of Illinois law.

2. Defendant owns and operates High 5 Casino (https://www.high5casino.com/), one of the most popular and profitable casino and sweepstakes gaming website on the planet.

3. Through High 5 Casino, users can access and play thousands of popular casino games, including, *inter alia*, jackpots, slots, roulette, and Megaways titles (the "Chance Games"). Some of these games are even hosted by live dealers in real-time, further mimicking the experience of a physical casino.

4. The Chance Games offered on High 5 Casino are unequivocally games of chance. Their outcomes are determined primarily, if not exclusively, by randomization—rendering them indistinguishable from the games found in traditional, brick-and-mortar casinos.

5. To evade regulatory scrutiny and mislead consumers, High 5 markets itself as a "social casino." This designation is purely cosmetic, designed to create the false impression that the platform provides benign, entertainment-only gameplay, when in reality it facilitates and profits from illegal gambling.

6. In practice, High 5 operates in a manner virtually indistinguishable from a traditional online casino. Players can purchase in-game currency, use that currency to wager on games of chance, and subsequently redeem their winnings for cash or gift cards. High 5 Casino's rapid growth and popularity are directly attributable to its realistic casino-like experience, which includes authentic gameplay, partnerships with well-known gaming studios, robust bonus programs, and fast, reliable payout systems.

7. High 5 derives its revenue primarily through the sale of in-game currency—specifically, virtual coins—which function as a de facto substitute for real money and are necessary for users to participate in games on the platform.

8. The platform features two forms of virtual currency: "Game Coins" and "Sweeps Coins." While Game Coins are offered with promotional bonuses such as sign-up rewards and daily refills, ensuring continuous user engagement, they are marketed as having no real-world monetary value.

9. However, High 5 conceals the true nature of its business model. The purchase of Game Coins is typically "bundled" with Sweeps Coins—another currency that **does** carry real-

world value.[1]

10.     Players use Sweeps Coins to enter sweepstakes-style games, which offer the chance to win cash or gift cards.

11.     After meeting a minimal 1x playthrough requirement and collecting at least 100 Sweeps Coins, players can redeem them for cash prizes. Alternatively, with a minimum of 50 Sweeps Coins, players can redeem for gift cards. In effect, players are wagering a valuable currency (Sweeps Coins) on games of chance in order to obtain prizes of greater value—a textbook definition of gambling.

12.     The structure and pricing of High 5's virtual currency offerings make clear that the platform's true aim is to facilitate and profit from the sale of Sweeps Coins. Despite nominal distinctions between the two types of currency, the underlying games are purely games of chance; they require little to no skill to determine the outcome.

13.     Virtual gambling is highly addictive. Moreover, under Illinois law, gambling is strictly regulated. The state's regulatory framework mandates that such games may only be offered by licensed operators at approved physical locations. High 5's operations flout these legal requirements by providing unlicensed gambling services to Illinois residents via the internet.

14.     Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

---

[1] According to player reviews, High 5 Casino's most enticing feature is its significant bonus bundle. https://sweepskings.com/reviews/high-5/ (last accessed October 17, 2025). Upon registration, new users generally receive 250 Games Coins and 5 Sweeps Coins. *Id.* (last accessed October 17, 2025).

## PARTIES

15.     At all times material hereto, Plaintiff Kennille Collins has been and is a citizen of, and domiciled in, Chicago, Illinois.

16.     Defendant High 5 Entertainment LLC is a limited liability company existing and organized under the laws of New Jersey, with its headquarters and/or principal place of business located in Mahwah, New Jersey. All of Defendant's members are citizens of the State of New Jersey. Therefore, Defendant is considered a citizen of New Jersey for purposes of 28 U.S.C. §1332(d). Defendant owns and operates a gambling website (available at https://www.high5casino.com/) and app under the brand "High 5 Games." Defendant conducts business within the venue of this District and throughout Illinois generally, which website, apps and operations are not permitted and are illegal under Illinois law.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff, or class member, or class member and one defendant.

18.     This Court has personal jurisdiction over Defendant because, as further described below, Defendant continuously and systematically conducts business and is authorized to conduct business here. Defendant sells its products to consumers in Illinois, including to Plaintiff.

19.     Moreover, Defendant actively disseminates targeted advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in Illinois, and/or otherwise

intentionally avails itself of the Illinois market.

20. Defendant has purposefully directed its activities toward this District.

21. Defendant has purposefully availed itself of the privileges of conducting activities in this District.

22. Plaintiff's claim arises out and relates to Defendant's forum-related activities.

23. The exercise of jurisdiction over Defendant is reasonable.

24. Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States. This localization includes changes to the language and currency presented in High 5 Casino.

25. Upon information and belief, Defendant has sold millions of dollars of virtual items to thousands of Illinois residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

26. High 5 Casino facilitates ongoing economic activity between thousands of Illinois players and Defendant.

27. Upon information and belief, Defendant directly controls whether consumers in Illinois can complete purchases from High 5 Casino.

28. Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from Illinois.

29. Upon information and belief, Defendant has the capability to prevent Illinois residents from completing purchases or placing wagers in High 5 Casino, but has chosen to accept those purchases and wagers from Illinois residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

30. Upon information and belief, Defendant has taken no steps to restrict Illinois

residents' access to High 5 Casino or to restrict the ability of Illinois residents to make purchases from High 5 Casino.

31.     Upon information and belief, in order to distribute High 5 Casino via the Apple app store and Google play store, Defendant entered into a developer agreement with Apple and Google.

32.     Upon information and belief, these advertisements for High 5 Casino were designed and directed to attract consumers in the United States, including this District, to play High 5 Casino.

33.     Upon information and belief, Defendant has the capability of targeting its High 5 Casino advertisements by geography and the capability of excluding residents of Illinois from the reach of Defendant's advertisements for High 5 Casino.

34.     Upon information and belief, Defendant partners with Meta Platforms, Inc. to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in High 5 Casino, including residents of Illinois. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in Illinois.

35.     Upon information and belief, Defendant has taken no steps to restrict its advertisements for High 5 Casino from reaching residents of Illinois.

36.     Upon information and belief, in addition to Apple and Google, Defendant has entered into development agreements with Amazon for the distribution of High 5 Casino app, which has offices in Illinois. Upon information and belief, under each of those agreements, Defendant has accepted responsibility for the compliance of High 5 Casino with federal and state laws, including those of Illinois.

37.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in High 5 Casino occurred in this District.

38.     Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in Illinois on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

39.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within Illinois, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

40.     The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.     *The Problem of Online Gambling*

41.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

42.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[2] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[3]

43.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems,

---

[2]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_source=chatgpt.com (last accessed October 17, 2025).

[3] *See id.*

while an additional five to eight million experiencing significant issues.[4] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[5]

44.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[6]

45.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[7]

46.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[8] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

47.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple

---

[4]    https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed October 17, 2025).

[5] https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed October 17, 2025).

[6] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed October 17, 2025).

[7]    https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_source=chatgpt.com (last accessed October 17, 2025).

[8] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed October 17, 2025).

effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

48. In Illinois, it is illegal to operate and offer online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. *See generally* 720 ILCS 5/28-1(a)(12) *et. seq.* In this regard, Illinois has a fundamental and deep-rooted public policy against gambling.

49. Despite Illinois' clear prohibition on online gambling, Defendant operates unlicensed and illegal online casinos within Illinois, as discussed further below.

**II.     *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.***

50. High 5 Casino advertises itself as a "social casino" website to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. High 5 Casino claims it is a "free" play casino. High 5 prominently represents that it does "**NOT OFFER 'REAL MONEY GAMBLING.'**" (emphasis in original). However, this representation is false and misleading. In practice, High 5 Casino enables users to engage in real-money gambling through its system of Sweeps Coins, deceiving consumers into believing they are participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

51. The High 5 Casino platform offers a wide variety of casino-style games, including digital slot machines, poker, roulette, and lottery-style wheels. Through these games, Defendant provides users the opportunity to win sweepstakes prizes by accumulating and redeeming so-called Sweeps Coins. Here is an example of one of its games:



52.     Users can access High 5 Casino via its website or through mobile applications available on the Apple App Store and Google Play Store for download by users throughout the United States, including in Illinois.

53.     Upon accessing the platform, users are presented with an array of casino-style games, prominently including slots, roulette, and poker.

54.     Once a user selects a game, they are prompted to wager either Game Coins or Sweeps Coins to play.




55.     As depicted in the illustrations above, High 5 Casino makes it easy to switch between wagering Game Coins and Sweeps Coins in the actual game with just a toggle at the top of the screen. This simple mechanism is designed to make it as convenient as possible for players to transition to gambling with real-world stakes. Players who start out having fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

56.     After selecting their game, players then place their wagers by selecting the amount of Game Coins or Sweeps Coins they wish to stake per round or spin. Depending on the outcome of the game, players may win additional coins, functioning in the same manner as traditional gambling wagers.

57.     In addition to automated games, High 5 Casino also offers a "live casino" feature, where users play games like roulette with live human dealers who are visible through webcam streams, closely mimicking the experience of a physical casino.



58.     Simply put, the games of chance offered by High 5 Casino—including slots and roulette—constitute gambling. These games are functionally identical to those offered in traditional casinos, such as those in Las Vegas.

59.     When consumers first visit the High 5 Casino platform, they are provided with a quantity of free Game Coins. Additional Game Coins may be obtained through promotional giveaways and other marketing efforts.

60.     Consumers also use Sweeps Coins to play games on the platform. Unlike Game Coins, Sweeps Coins are redeemable for cash and gift cards. Upon information and belief, each Sweeps Coin is equal in value to $1 USD in prizes, rendering Sweeps Coins a proxy for real money.

61.     Plaintiff and, upon information and belief, the vast majority of players on the High 5 Casino platform regularly buy additional coin bundles when they run out of Sweeps Coins even when they already possess unused Game Coins. The fact that players are making these repeated

purchases when they have ample Game Coins confirm that these transactions are driven entirely by the desire to obtain Sweeps Coins for real-money gambling, rather than for the Game Coins that Defendant sells.

62.     Users may acquire Sweeps Coins through various means, including promotional giveaways, participation in contests or daily missions, and most commonly, through the purchase of Game Coins. The more Game Coins a user buys, the more Sweeps Coins they receive as an alleged "bonus." In reality, Defendant uses the sale of Game Coins as a vehicle for the sale of Sweeps Coins, misleadingly marketing the transaction to obscure the real-money nature of the exchange.



63.     Once obtained, users gamble with Sweeps Coins in the same manner as they do with Game Coins. However, because Sweeps Coins are redeemable for real-world value, users who wager Sweeps Coins are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

64.     Further, Defendant imposes a "1x playthrough" requirement on bonus Sweeps

Coins, mandating that players must wager an amount equal to the number of bonus Sweeps Coins they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Sweeps Coins, a player must first wager at least 25 Sweeps Coins on casino-style games offered through the High 5 Casino platform. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Defendant's operations.

65.     Illinois Statute § 720 ILCS 5/28-2(a) broadly defines a "gambling device" as "any clock, tape machine, slot machine or other machines or device for the reception of money or other thing of value on chance or skill or upon the action of which money or other thing of value is staked, hazarded, bet, won, or lost; or any mechanism, furniture, fixture, equipment, or other device designed primarily for use in a gambling place."

66.     Users of High 5 Casino stake or risk something of value when playing the games of chance offered on Defendant's platform. Specifically, players use Game Coins or Sweeps Coins to participate in various casino-style games, the outcomes of which are determined predominantly by chance rather than skill. When using Sweeps Coins, players risk these digital tokens in hopes of winning additional Sweeps Coins, which may then be redeemed for cash or other real-world prizes. If the player wins, they retain or increase the number of coins wagered; if they lose, the coins are forfeited. This dynamic is materially distinct from traditional video games, where in-

game currency is expended as a fee to play, irrespective of win or loss. In contrast, High 5 Casino mirrors the fundamental mechanics of real-money gambling, in which players risk a valuable consideration for the opportunity to win additional value.

67.     While some user interaction is involved, the outcomes of High 5 Casino's games are overwhelmingly determined by chance. Games such as digital slots, roulette, and lottery-style spins rely on random number generators or similar chance-based algorithms. Upon information and belief, the results of these games are not influenced by any player skill or decision-making, but are driven entirely by software that introduces randomness. As such, the element of chance predominates in determining game outcomes.

68.     The absence of skill components further emphasizes High 5 Casino's reliance on chance. Games commonly recognized as gambling, such as blackjack, craps, and interactive slot machines, incorporate some player decisions or interactivity. Therefore, the limited degree of user interaction does not remove High 5 Casino's games from the definition of a "game of chance" or "contest of chance" under Illinois law. High 5 Casino closely resembles so-called "I-Slots" (interactive slot machines), which allow limited user choice but are still fundamentally games of chance.

69.     Even players with significant experience or familiarity with casino-style games can lose repeatedly if the game's randomizing mechanism is not favorable. Conversely, novice or inexperienced users may win if the randomized outcome happens to align in their favor. This inherent unpredictability underscores that the dominant factor in the outcome of each game is chance—not skill, strategy, or experience.

70.     Game Coins and Sweeps Coins constitute things of value under Illinois law and other applicable gambling statutes. These coins provide players with access to services,

entertainment, and the privilege of continued gameplay without charge. Sweeps Coins, in particular, function as a "representative of value" because they are redeemable for real-world prizes, including cash and gift cards.

71.　　The casino-style games on High 5 Casino closely mimic the experience of traditional gambling establishments. These games feature audiovisual elements—including slot machine graphics, sounds, animations, and game mechanics—that replicate the look and feel of real-world casino games, further blurring the line between entertainment and gambling.

72.　　In sum, Defendant's casino platform hosts casino-style games that are unmistakably games of chance. By offering these games of chance, Defendant is operating unregulated online casinos in violation of Illinois law, which explicitly prohibits gambling on games of chance conducted over the internet. 720 ILCS 5/28-1(a)(12).

### III.　*Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s*

73.　　In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

74.　　Most state gambling statutes define gambling as involving three core elements: (1) consideration**,** (2) chance**,** and (3) a prize. Operators of these Internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by brands like large brands. But this

separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

75.     Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

76.     In *Windy City Promotions, LLC v. Illinois Gaming Board*, 87 N.E.3d 915 (Ill. App. Ct. 2017), the Illinois Appellate Court firmly rejected a familiar tactic used to sidestep gambling laws. There, the plaintiffs operated electronic kiosks that dispensed coupons in exchange for cash and entered users into sweepstakes games that mimicked slots and poker. *See id.* at 917. Plaintiffs contended that their devices were not gambling machines because consumers were ostensibly purchasing promotional coupons and not paying for the chance to win. *See id.* at 918. The court found this distinction unavailing, concluding that the kiosks violated Illinois gambling law, as the devices offered a chance to win a prize in exchange for consideration, meeting the statutory definition of illegal gambling regardless of how the transaction was framed. *Id.*

77.     *Windy City Promotions* reflects a broad consensus among courts nationwide: the use of nominal product sales or alternative free-entry routes does not shield operators from liability when the dominant purpose of the enterprise is gambling. The underlying structure—consideration exchanged for a chance to win a prize through a game of chance—remains unchanged and unlawful.

78.     High 5 Casino now attempts to revive this discredited model. Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

79.     As detailed below, High 5 Casino employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Sweeps Coins"—with real-world value— for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

80.     This is not the first time Defendant has faced scrutiny. In *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024), a federal court granted summary judgment against High 5 Casino. Defendant's license was also summarily suspended by the Connecticut Department of Consumer Protection on March 14, 2025, for alleged violations of Connecticut's gaming laws. And shortly thereafter, on March 18, 2025, the Maryland Lottery & Gaming Control Agency sent Defendant a cease-and-desist letter ordering it to stop offering unauthorized online gambling.

81.     Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. Defendant's operations are not novel—they are a modern replica of a failed and unlawful model.

82.     The harm caused by Defendant's illegal gambling operation is further exacerbated by its lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendant operates without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

83.     Indeed, Defendant's online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendant disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance

with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. See 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

## FACTS SPECIFIC TO PLAINTIFF

### *Plaintiff Collins' Experience*

84.     In response to social media advertisements, Plaintiff Collins signed up and began playing High 5 Casino in or around April 2025 during which she made many in-game purchases of Game Coins and Sweeps Coins.

85.     Plaintiff Collins accessed High 5 Casino from her residence in Illinois. Plaintiff Collins received an initial allotment of Game Coins and Sweeps Coins. After losing her initial allocation of free Game Coins and Sweeps Coins, Plaintiff Collins began purchasing Game Coins and Sweeps Coins from Defendant and did so from Illinois, which Defendant accepted.

86.     Plaintiff Collins placed a substantial amount of her wagers in High 5 Casino in Illinois.

87.     Overall, Plaintiff Collins wagered and lost hundreds of dollars in real-world currency while using High 5 Casino and its games of chance. Plaintiff Collins lost the Sweeps Coins and Game Coins she purchased from Defendant by wagering them in High 5 Casino's games of chance.

88.     By and through High 5 Casino's gambling features described above, Plaintiff Collins was induced into making these purchases that she otherwise would not have made.

89.     As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

90.     Plaintiff Collins enjoys playing online games and has an ongoing interest in playing High 5 Casino if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff Collins therefore has an ongoing interest in High 5 Casino complying with state and federal gambling laws and consumer protection statutes.

### CLASS ALLEGATIONS

91.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of herself and all others similarly situated defined as follows:

92.     The Class is defined as follows:

> **Illinois Class**: All Illinois residents who, during the applicable limitations period, have lost money wagering on Defendant's online casino games.

> **Illinois Loss Recovery Subclass**: All persons in Illinois who have lost at least $50 in currency wagering on Defendant's online casino games.

93.     Collectively, the "Illinois Class" and "Illinois Loss Recovery Subclass" shall be referred to as the "Classes." Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

94.     **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's

books and records and other third-party sources.

95.  **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

    a.  Whether the games in High 5 Casino are gambling as defined under Illinois law;

    b.  Whether Defendant engaged in the conduct alleged in the Complaint;

    c.  Whether Defendant violates the statutes listed below in Counts I, II, and III;

    d.  Whether Defendant violated statutes analogous to those alleged herein applicable;

    e.  Whether and how Defendant manipulates the odds in games offered in High 5 Casino;

    f.  Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

    g.  Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

96.  **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of High 5 Casino who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

97.  **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Plaintiff has retained counsel with substantial experience in

prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

98.     **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

99.     **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the Illinois Loss Recovery Act
### 720 ILCS 5/28-8
### (*On Behalf of Plaintiff and the Illinois Loss Recovery Subclass*)

100.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–99 by reference as if fully set forth herein.

101.     Plaintiff brings this count individually and on behalf of the Illinois Loss Recovery Subclass.

102.     720 ILCS 5/28-8(a) provides that:

Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.

103.     The Illinois Supreme Court has found that the "purpose of section 28-8(a) is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.'" *Dew-Becker v. Wu*, 178 N.E.3d 1034, 1037-38 (quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997)).

104.     Plaintiff, Illinois Loss Recovery Subclass members, and Defendant are "persons" under 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual, natural person, public or private corporation . . . partnership, unincorporated association, or other entity.").

105.     The activity of "gambling" includes anyone who, *inter alia*, "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), "knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28-1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28-1(a)(3).

106.     The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28-2(a).

107.     Defendant's Sweep Coins constitutes money or a thing of value because its value is directly tied to the U.S. Dollar at a 1:1 ratio and can be redeemed for real cash prizes through Defendant's platform. Just like casino chips in a brick-and-mortar casino, Sweeps Coins serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

108.    Defendant's online casino platform is an Internet site and app that permits consumers to play games of chance (e.g., online slot machines) for money or other things of value (Sweeps Coins).

109.    Every casino game offered on Defendant's online platform is a "gambling device" because they accept money or other valuable items (Sweeps Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Sweeps Coins) with the potential to win or lose money or other valuable items (Sweeps Coins).

110.    Defendant's games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendant is the "winner" under the statute because it has a direct stake in the result of the gambling. When players wager Sweeps Coins on games of chance and win, they can redeem their winnings at a 1:1 ratio with the U.S. Dollar—meaning Defendant incurs the equivalent monetary loss. Conversely, when players bet Sweeps Coins on games of chance and lose, Defendant retains the full value of the lost Sweeps Coins, just as traditional casinos profit from losing bets placed against the house.

111.    By wagering and losing Sweeps Coins on Defendant's casino platform, Plaintiff and each member of the Illinois Loss Recovery Subclass gambled and lost money or things of value.

112.    Plaintiff and the members of the Illinois Loss Recovery Subclass have each lost more than $50 gambling on Defendant's platform.

113.    Defendant owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the Illinois Loss Recovery Subclass members' gambling losses. Defendant is therefore the "winner" under 720 ILCS 5/28-8(a) of all moneys lost by

Plaintiff and the Illinois Loss Recovery Subclass members.

114.    High 5 Casino operates an illegal gambling website that is accessible in Illinois.

115.    Plaintiff's and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendant's online casino games were played by Illinois residents on computers, mobile phones, and mobile devices in the State of Illinois. Defendant had actual knowledge that Plaintiff and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their state of residence and provided their complete home address pursuant to Defendant's mandatory registration process.

116.    Plaintiff, on behalf of herself and the Illinois Loss Recovery Subclass members, seek an order requiring Defendant to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS §§ 505/1, *et seq.***
***(On behalf of Plaintiff and the Illinois Class)***

117.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–99 by reference as if fully set forth herein.

118.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, bars any unlawful, unfair, or deceptive conduct in trade or commerce. This includes acts such as misrepresentation, false advertising, fraud, false promises or pretenses, and the concealment or omission of material facts.

119.    The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

120.    Defendant is a "person" as defined by 815 ILCS 505/1(c).

121.     Plaintiff and the Illinois Class are "consumers" under 815 ILCS 505/1(e).

122.     Sweeps Coins are "merchandise" within the meaning of 815 ILCS 505/1(b) and Defendant's sale of Sweeps Coins constitutes "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

123.     High 5 Casino's practices described above, including the operation of an illegal casino and the sale of Sweeps Coins, were unfair within the meaning of the ICFA because they constitute unlawful and unregulated gambling.

124.     Defendant's practices described above, including their operation of illegal casino platform and sale of Sweeps Coins, were unfair within the meaning of the ICFA because they offended Illinois' public policy against unlawful and unregulated gambling. *See, e.g.*, 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who purchased sweeps coins on the High 5 Casino platform.

125.     Defendant caused substantial injury to Plaintiff and the Illinois Class by inducing them to purchase and wager Sweeps Coins through the design of its illegal gambling platform. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

126.     Defendant's unfair practices occurred during the marketing and sale of Sweeps Coins for use on High 5 Casino' illegal gambling platform, and thus, occurred in the course of trade and commerce.

127. Defendant represents to consumers, including Plaintiff, that it does "**NOT OFFER 'REAL MONEY GAMBLING'**" (emphasis in original), its casino games are not gambling, and consumers can play for "free." Plaintiff relied on these representations in playing High 5.

128. Further, Defendant conceals from consumers, including Plaintiff and the Illinois Class, that wagering with Sweeps Coins on its platform constitutes illegal gambling prohibited by state law. Throughout its website and in its terms and conditions, High 5 lists numerous states where its platform and games are not accessible, but it glaringly omits Illinois from the list of restricted territories.

129. To make matters worse, Defendant's online casino fails to provide the statutorily required consumer protections that every licensed casino in the State of Illinois must provide. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

130. Rather than offering substantive assistance to players facing gambling addiction, Defendants provide only superficial and deceptive assurances about "Responsible Social Gameplay," falsely framing its casino games are for "entertainment purposes only" and that coins many never be redeemed for real money or things of value, instead of being truthful that its platform promotes and facilitates real-money gambling. *See* High 5 Casino, *Responsible Social Gameplay Policy,* https://high5casino.com/responsible-play/ (last updated November 7, 2024) ("ALL CUSTOMERS OF HIGH 5 CASINO NEED TO UNDERSTAND THAT ALL OF OUR GAMES ON OUR PLATFORM ARE DESIGNED FOR ENTERTAINMENT PURPOSES ONLY. GAME COINS MAY NEVER BE REDEEMED FOR REAL MONETARY INSTRUMENTS OR ITEMS OF VALUE BY ANY PARTY.") (emphasis altered).

131.    Defendant aggressively markets and advertises its platform on social media while at the same time concealing that it is illegal under state law. As such, Illinois consumers, including Plaintiff and the Illinois Class, are highly likely to continue to encounter current and future iterations of Defendant's illegal platform absent injunctive relief.

132.    Not only is Defendant's conduct unfair, but as discussed above, Defendant's conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28-1(a)(1), and knowingly use gambling devices, 720 ILCS. 5/28-1(a)(3).

133.    Further, Defendant's conduct is immoral because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

134.    As a direct and proximate result of Defendant's violations of the ICFA, Plaintiff and the Illinois Class members have suffered harm in the form of monies paid and lost for Defendant's Sweeps Coins.

135.    Plaintiff, on behalf of herself and the Illinois Class members, seeks an order requiring Defendant to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiff and the Illinois Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**

*(On behalf of Plaintiff and the Illinois Class)*

136.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–99 by reference as if fully set forth herein.

137.     Plaintiff and the Illinois Class members have conferred a benefit upon Defendant in the form of the money they paid for the purchase of Sweeps Coins to wager on Defendant's illegal casino platform.

138.     Defendant appreciates and has knowledge of the benefits conferred upon it by Plaintiff and the Illinois Class.

139.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the Illinois Class members, which Defendant has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

140.     Accordingly, Plaintiff and the Illinois Class members seek full disgorgement of all money Defendant has retained as a result of the wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and her counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: October 20, 2025

Respectfully submitted,

By: */s/ Scott Edelsberg*
**EDELSBERG LAW, P.A.**
Scott Edelsberg
Gabriel Mandler
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: 305-975-3320
scott@edelsberglaw.com
gabriel@edelsberglaw.com

**SHAMIS & GENTILE, P.A.**
Andrew Shamis
Edwin Elliott
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

*Counsel for Plaintiff and the Proposed Class*